**RECORD NO. 13-4755(L)**
**CONSOLIDATED W/ 13-4931**

═══════════════════════════════════════

# IN THE

# United States Court of Appeals

## FOR THE FOURTH CIRCUIT

─────────────

## UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

## KEVIN GARCIA FUERTES
and
## GERMAN DE JESUS VENTURA,

─────────────

*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND AT BALTIMORE
The Honorable William D. Quarles, Jr., Presiding

─────────────

### CONSOLIDATED OPENING BRIEF OF APPELLANTS

─────────────

Michael D. Montemarano*
Michael D. Montemarano, PA
Suite 146
10630 Little Patuxent Parkway
Columbia, MD 21044
(410) 992-0067
montemarano67@gmail.com

*\*Lead Counsel & Counsel for*
*Appellant Kevin Garcia Fuertes*

Nicholas J. Vitek
VITEK LAW LLC
111 South Calvert Street, Suite 2700
Baltimore, MD 21202
(410) 317-8500
vitek@viteklaw.com

*Counsel for Appellant*
*German De Jesus Ventura*

LANTAGNE LEGAL PRINTING 801 East Main Street Suite 100 Richmond, Virginia 23219 (804) 644-0477
A Division of Lantagne Duplicating Services

# TABLE OF CONTENTS

Page

Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

Table of Citations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Statement of Subject Matter and Appellate
     Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Statement of the Issues Presented for Review . . . . . . . . . . . . . . . . . . . . . . . 3

Statement of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Summary of the Arguments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Arguments:

      **I.    THE DISTRICT COURT ERRED IN DENYING THE APPELLANTS' MOTION TO PRECLUDE EVIDENCE OF VIOLENT ACTS OR THREATS MADE TO INDIVIDUALS WHO WERE NOT VICTIMS OF THE CHARGED SEX TRAFFICKING OFFENSE.** (Both Appellants) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

      **II.   THE DISTRICT COURT ERRED BY PERMITTING DR. MARY-THERESA BAKER TO TESTIFY AS AN EXPERT SINCE SHE PROVIDED NO EXPERT TESTIMONY AND HER TESTIMONY SERVED SOLELY TO OFFER AN OPINION ON THE TRUTHFULNESS OF THE GOVERNMENT'S MAIN WITNESS**. (Both Appellants) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

      **III.  THE DISTRICT COURT ERRED BY NOT GRANTING APPELLANT VENTURA'S MOTION FOR JUDGMENT OF ACQUITTAL WITH RESPECT TO COUNT 7, SINCE 18 USC § 1591 IS NOT CATEGORICALLY A CRIME OF VIOLENCE.** (Appellant Ventura) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

i

**IV.  THERE WAS INSUFFICIENT EVIDENCE TO SUSTAIN THE CONVICTION OF APPELLANT FUERTES ON COUNT 6, FOR SEX TRAFFICKING OF "R.D.F." BY FORCE, FRAUD AND COERCION DURING THE PERIOD AFTER DECEMBER 23, 2008.** (Appellant Fuertes) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

Request for Oral Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

Conclusion  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

Certificate of Compliance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

Certificate of Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

# TABLE OF AUTHORITIES

## CASES

*Begay v. United States,*
    553 U.S. 137 (2008)......................................................................... 51-52

*Bruton v. United States,*
    391 U.S. 123 (1968)...............................................................................34

*Burks v. United States,*
    437 U.S. 1 (1978)...................................................................................57

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
    509 U.S. 579 (1993).........................................................................46, 47

*Delaware v. Van Arsdall,*
    475 U.S. 673 (1983)...............................................................................31

*Descamps v. United States,*
    —U.S. —, 133 S. Ct. 2276 (2013) ...................................................50, 53, 54

*Glasser v. United States,*
    315 U.S. 60 (1942)...........................................................................49, 56

*Global Tech Appliances, Inc., v. SEB S.A.,*
    563 U.S. —, 131 S. Ct. 2060; 179 L. Ed. 2d 1167 (2011) .............................60

*Huddleston v. United States,*
    485 U.S. 681 (1988)...............................................................................15

*Jackson v. Virginia,*
    443 U.S. 307 (1979).......................................................................49-50, 57

*Johnson v. United States,*
    559 U.S. 133 (2010)...............................................................................51

*Kotteakos v. United States,*
    328 U.S. 750 (1946).........................................................................42, 43

*Ortega-Rodriguez v. United States*,
507 U.S. 234 (1993)................................................................50, 57

*Scott v. Sears Roebuck & Co.*,
789 F.2d 1052 (4th Cir.1986) .......................................................46

*United States v. Abu Ali*,
528 F.3d 210 (4th Cir. 2008) ........................................................42

*United States v. Benally,*
541 F.3d 990 (10th Cir. 2008) ......................................................46

*United States v. Bynum*,
604 F.3d 161 (4th Cir. 2010) .................................................49, 56

*United States v. Curtis*,
782 F.2d 593 (6th Cir.1986) .........................................................34

*United States v. Dorsey,*
45 F.3d 809 (4th Cir.1995) ...........................................................46

*United States v. Forrest*,
429 F.3d 73 (4th Cir. 2005) ..........................................................31

*United States v. Foutz*,
540 F.2d 733 (4th Cir.1976) .........................................................34

*United States v. Garcia,*
—F.3d —, 2014 WL. 1924857 (4th Cir. 2014)............................45

*United States v. Harris,*
701 F.2d 1095 (4th Cir. 1983) ......................................................32

*United States v. Harvey*,
532 F.3d 326 (4th Cir. 2008) .................................................49, 56

*United States v. Hedgepeth,*
434 F.3d 609 (3d Cir. 2006) .........................................................37

*United States v. Johnson*,
    617 F.3d 286 (4th Cir.2010) ............................................................45

*United States v. Lanza*,
    790 F.2d 1015 (2d Cir. 1986) ........................................................60

*United States v. Lespier,*
    725 F.3d 437 (4th Cir. 2013) *cert. denied,* 134 S. Ct. 974 (2014) .................47

*United States v. Lowe*,
    65 F.3d 1137 (4th Cir. 1995) ....................................................49, 57

*United States v. Mason*,
    52 F.3d 1286 (4th Cir. 1995) ........................................................31

*United States v. McLean*,
    715 F.3d 129 (4th Cir.2013) ........................................................45

*United States v. Myers*,
    280 F.3d 407 (4th Cir. 2002) ........................................................38

*United States v. Queen*,
    132 F.3d 991 (4th Cir. 1997) ........................................................40

*United States v. Romer*,
    148 F.3d 359 (4th Cir. 1998) ....................................................49, 56,

*United States v. Royal.*,
    731 F.3d 333 (4th Cir. 2013) ................................................... 54-55

*United States v. Royal*,
    731 F.3d 333 (4th Cir. 2013) *cert. denied,* 134 S.Ct. 1777 (2014)................55

*United States v. Tedder*,
    801 F.3d 1437 (4th Cir. 1896) ........................................................40

*United States v. Torres-Miguel,*
    701 F.3d 165 (4th Cir.2012).........................................................55

v

*United States v. Tresvant*,
    677 F.2d 1018 (4th Cir. 1982) ............................................................49, 56, 57

*United   States v. Van Metre*,
    150 F.3d 339 (4th Cir. 1998) ........................................................................40

*United States v. Williams*,
    445 F.3d 724 (4th Cir. 2006) ........................................................................38

*United States v. Wilson*,
    484 F.3d 267 (4th Cir .2007) ........................................................................45

*United States v. Young*,
    609 F.3d 348 (4th Cir. 2010) ..................................................................49, 56

*United States v. Zayyad*,
    741 F.3d 452 (4th Cir. 2014) ........................................................................34

## STATUTES

18 U.S.C. § 371 ..........................................................................................5, 35, 36
18 U.S.C. § 924..................................................................................................51
18 U.S.C. § 924(c) ........................................................................6, 35, 50, 51, 56
18 U.S.C. § 1591 .....................................................................................*Passim*
18 U.S.C. § 1591(a) ....................................................6, 28, 29, 36, 50, 52
18 U.S.C. § 1961................................................................................................41
18 U.S.C. § 2421 ........................................................................................5, 35, 36
18 U.S.C. § 2422........................................................................................5, 36
18 U.S.C. § 2422(a) ..................................................................................5, 35
18 U.S.C. § 3231 ................................................................................................2
28 U.S.C. § 1291................................................................................................2

## RULES

F.R.Cr.P. 7...........................................................................................37
F.R.Cr.P. 52(a) ...................................................................................42
F.R.Evid. 401 ......................................................................30, 31, 33, 39
F.R.Evid. 403 ............................................................................30, 39, 40
F.R.Evid. 404(b).................................................................................23
F.R.Evid. 702 ................................................................................45, 46, 47
F.R.Evid. 702(a).................................................................................46

IN THE

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

————

Nos. 13-4755 (L), 13-4931

————

**KEVIN FUERTES & GERMAN VENTURA,**

*Appellants,*

v.

**THE UNITED STATES OF AMERICA**,

*Appellee.*

————

JOINT BRIEF OF APPELLANTS

————

ON APPEAL FROM
THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND,
NORTHERN DIVISION
(William D. Quarles, Jr., USDJ)

————

Nicholas Vitek, Esq.
Vitek Law LLC
111 North Calvert Street
Suite 2700
Baltimore, MD 21202
(410) 317-8500/Fax 317-8511

For Appellant Ventura

Michael D. Montemarano
Michael D. Montemarano, P.A.
10630 Little Patuxent Parkway
Suite 146
Columbia, MD 21044
(410) 992-0067/Fax 992-6915
For Appellant Fuertes
Lead Appellate Counsel

## STATEMENT OF SUBJECT MATTER
## <u>AND APPELLATE JURISDICTION</u>

This is an appeal from final judgment in a criminal case, entered against Appellants. Jurisdiction in the District Court was based upon 18 USC § 3231.

By Notices of Appeal timely filed in the district court, Appellants request this Court to review the final decision of the district court as to their convictions and sentences, pursuant to the jurisdiction conferred by 28 USC § 1291.

2

# STATEMENT OF
# THE ISSUES PRESENTED FOR REVIEW

*Issue I        (Both Appellants)*

Whether the district court erred in permitting evidence of other violent acts or threats of violent acts allegedly made by Appellants but directed against others, since the element of violence in each of the offenses charged in counts 1, 5, and 6 is required in each instance to be directed at or related to a victim of the charged sex trafficking offense?

*Issue II        (Both Appellants)*

Whether the district court erred in permitting an expert to testify and offer opinions, when she testified about a subject on which she did not provide any expert testimony and served solely to offer an opinion on the credibility of the government's main witness?

*Issue III        (Appellant Ventura)*

Whether the district court erred in denying Ventura's motion for judgment of acquittal on count 7, since 18 USC § 1591, as charged in count 6 and having no required element of violent or physical force, cannot be a crime of violence as a matter of law, per the Supreme Court in *United States v. Descamps*?

3

*Issue IV        (Appellant Fuertes)*

Whether there was insufficient evidence to sustain the conviction of Appellant Fuertes on count 6, for sex trafficking of "R.D.F." by force, fraud and coercion during the period after December 23, 2008, in light of the jury's acquittal of Fuertes for all conduct preceding that date?

## STATEMENT OF THE CASE

On November 29, 2011, the grand jury returned a superseding indictment alleging the following offenses:

**Count 1** – charging both Appellants with conspiracy in violation of 18 USC § 371 by conspiring to transport individuals in interstate commerce with the purpose they engage in prostitution in violation of 18 USC § 2421 and coercing or enticing an individual to engage in prostitution in violation of 18 USC § 2422, for conduct that allegedly occurred between March 2008 and November 2010.

**Count 2** – charging both Appellants with transporting individuals in interstate commerce for the purpose of prostitution in violation of 18 USC § 2421, for conduct that allegedly occurred between September 2008 and March 2009.

**Count 3** – charging Appellant Ventura with coercing or enticing an individual to engage in prostitution in violation of 18 USC § 2422(a), for conduct that occurred in or about September 2009.

**Count 4 and 5** – charging Appellant Ventura with interstate transportation of an individual in order for that person to engage in prostitution in violation of 18 USC § 2421, for conduct that occurred on or about August 2, 2010 (Count 4) and August 15, 2010 (Count 5).

**Count 6** – charging that both Appellants engaged in sex trafficking by force,

5

fraud or coercion in violation of 18 USC § 1591(a) for allegedly causing "R.D.F." to engage in prostitution.

**Count 7** – charging Appellant Ventura with the possession and use of a firearm in relation to a 'crime of violence' as described in Count 6, sex trafficking by force, fraud or coercion of "R.D.F." in violation of 18 USC § 924( c).

JA 35-48.

A nine day jury trial commenced on April 8, 2013 and concluded on April 19, 2013. JA 19-22 (docket). Appellant Ventura was convicted on each charge, and was sentenced to 60 months as to Count 1, 120 months as to Count 2, to run concurrent with count 1, 240 months as to Count 3 to run concurrent with counts 1 and 2, 120 months as to counts 4 and 5, to run concurrent with Counts 1, 2, and 3, 360 months as to count 6 to run concurrent with counts 1, 2, 3, 4, and 5, 60 months as to count 7 to run consecutive to counts 1, 2, 3, 4, 5, and 6 for a total term of 420 months. JA 1808-1886. Appellant Fuertes was acquitted of Count 2, but convicted of Counts 1 and 6, though only of a limited portion of this latter offense, as discussed, *infra*, and was sentenced to 60 months as to Count 1 and 235 months as to Count 6, to run concurrent for a total of 235 months. JA 1729-1794.

## STATEMENT OF FACTS

**I.  Evidence Introduced By The Government Of Acts Or Threats Of Violence Allegedly Committed By The Appellants.**

Prior to the start of trial, Appellants jointly moved to preclude the introduction of any reference to evidence of a murder that the Government believed was committed or commissioned by Appellants, or acts or threats against third parties, as well as any evidence that the Appellants may have possessed any firearms in connection with any of these acts.  JA 49-52.  Appellants argued that the offense conduct required acts of violence or threats of violence against those involved in the sex trade and thus any evidence of the above referenced acts would be irrelevant.  *Id.* To the extent that any such evidence was relevant, Appellants moved to preclude the evidence as more prejudicial than probative in violation of Rule 403 of the Federal Rules of Evidence.  *Id.*

The Government responded, arguing that any

> threats to, and violence against ... competitors engaged in prostitution – including evidence relating to the murder of Victor Ramirez-Rivas a/k/a 'El Pelon' …[was] instances of conduct [that] are part and parcel of the charged conspiracy to transport females, and entice females to travel, in interstate commerce to Maryland, and elsewhere, for purpose of prostitution, and thus cannot be said to be inadmissible.

JA 53-54.

Supporting the government's argument that these acts are part and parcel of the

7

conspiracy was the fact that these acts were explicitly charged in the conspiracy in paragraphs 17 and 18. JA 54. In addition, the Government argued that evidence of the murder of "El Pelon" "provided background and context of the investigation that followed[.] JA 54. The government also argued that threats of, and actual or claimed use of violence against, [sic] competitor pimps is relevant to the conduct charge in Count Six[.]" JA 56.

At a hearing the Appellants raised the issue saying that the issue may be relevant to the impact on prostitutes and their perceived coercion, but to introduce direct evidence of a murder would be to be unfairly prejudice the defendants since "it will deny the opportunity for the Defense to challenge the coercion aspect, because the jury will blow right by coercion to culpability with regard to what is, as we always acknowledge, the flagship offense in criminal law in that of murder[.]" JA 147.

In a written memorandum opinion, the district court ruled that such evidence was admissible because, "evidence of threats to third parties is relevant to the indictment's allegation that Fuertes and Ventura threatened competitor "pimps" to ensure the success of their own prostitution business. This evidence is not substantially outweighed by unfair prejudice, or any other factors under Rule 403." JA 115.

Absent from the Government's motion, as well as the district court's ruling, is

8

how such evidence is relevant to the charged conspiracy of interstate transportation of prostitutes or coercing or enticing any specific individual to engage in prostitution, in other words to make such an individual a victim of sex trafficking, as charged in the conspiracy count.  JA 53-131.  Both the government and the district court assume, without comment, that the acts or threats of violence against third parties is necessary or relevant to the elements to any of the offenses charged, and attains such status regardless of whether or not the victim of sex trafficking even was aware of such. This is reflected in the presentation of the government's case, which very nearly avoided all mention of the manner in which the alleged conduct by Appellants related to any of the alleged victims.

This position was adopted by the government and sustained by the court notwithstanding the Appellants argument in their motion to preclude precisely this evidence, that the "gravamen of the offense is a threat made to coerce a person **into the sex trade,** it does not speak to threats made generally to bolster the success of the criminal enterprises, such as those directed toward the competition." JA 50-51. (emphasis in original).  Simply put, threats to the competition are irrelevant to the offenses charged, as they have no effect upon the victim of the sex trafficking and are not necessary to – or an element of – the accomplishment of the crimes.

Given leave by the district court to do so, from the very outset of trial,

9

commencing in its opening, the government focused upon force and threats of force

directed toward others, intended to "eliminate the competition." JA 50-51.

The plainly troubling aspect of the admission of this evidence was compounded

by the fact that the government did not call the other victim of the shootings on the

night "El Pelon" was killed,, Nancy Marin Ayala. The district court was to hear from

her at Appellant Fuertes' sentencing. Ms Ayala flatly rejected the suggestion that

Appellant Fuertes was the man who had shot her and "El Pelon." JA 1749-1751. It

therefore is not surprising to note that when he went to trial in state court, Appellant

Fuertes was acquitted of all charges relating to the shooting of "El Pelon."

**1.** *Det. Jeffrey Hartlove*

    **a.** *Evidence Regarding The Murder Of "El Pelon"*

The first witness introduced by the Government was Det. Hartlove. Within the first

ten minutes of his testimony, the Government established that the Appellants were

suspects in a murder of "El Pelon." JA 231. Over the Appellants objection, the

detective went on to state to the jury that the victim was "shot multiple times in the

back of the head." JA 233.[1] The detective again was permitted, over Appellants

objection, to testify that a surviving non-testifying witness, Sylvia, identified two

---

    [1] The objection for one Appellant was considered the objection for both
Appellants unless one Appellant specifically chooses to opt out of the objection.
JA 293.

telephone numbers as those that had made threats to the victim before his murder, although she had not listened to the calls.[2]  The Appellants objected to Det. Hartlove testifying to the phone numbers or what they meant to a non-testifying and non-percipient individual.

> MR. MONTEMARANO:  We would renew our objection to the testimony from Sylvia. There is no way in the world this detective should be permitted to testify as to what this woman claimed these numbers meant, especially in light of the fact that it's not her phone. She didn't answer these calls. She's claiming these calls are threats coming in on someone else's phone, that she can identify the calls in the sense of, "Well, I remember him getting a call at this date and time," because that's what time the phone says, but, in terms of what the calls were about, she wasn't participatory in these phone calls, so she couldn't even testify to that, but how Det.  Hartlove can testify to it is beyond me.

> MR. CUNNINGHAM:  Well, Your Honor, it's not whether or not the threats came from those numbers, but the fact that they had significance to them in the context of this investigation. That's the basis for eliciting the testimony.

> THE COURT:  Not offered for truth?

> MR. CUNNINGHAM:  No.

---

[2]  The jury was left with the impression that the threatening calls were made in the time immediately preceding the murder as no timeline was established by the Government as to when the calls were made.  There was, however, evidence that the threats were made several months before, but the Appellants were not permitted to cross examine the  detective  on this point, or to contrast Det. Hartlove's testimony with her grand jury testimony, since the statement came from the non-testifying witness. JA 463-469.

JA 254-255.

Yet despite the argument that this evidence was not offered for the truth, there was no limiting instruction to the jury that the detective was merely describing his investigation. This same end, describing to the jury how he came to be investigating certain phone numbers, could have been achieved without conveying irrelevant and incompetent evidence to the jury, by simply inquiring "What did you do after speaking with Sylvia?" instead of inquiring why he did what he did. Rather, after relating that he received numbers from Sylvia related to threats to the victim, Det. Hartlove was then was then asked if one of or both of those numbers, and perforce the threats, were connected to Appellants. JA 235-236, 245, 252-256, 259-261. Det. Hartlove testified that one of the numbers was found in a car driven by Appellant Fuertes, and that the second number was a number related to a house used for prostitution that would later be connected to Appellant Ventura. JA 235-247. Later, Det. Hartlove was to testify in a similar fashion that a number from a phone found to be on Appellant Ventura was used to threaten neighbors of a house of prostitution who had took in a prostitute and that Appellant Ventura was "a suspect in a homicide." JA 311, 343, 354, 361. On cross-examination Det. Hartlove testified, however, that he never witnessed any force directed toward any of the women who were traveling to work for Appellant Ventura, which is to say those women who were

the foundation to counts 1, 2, 3, 4, and 5. JA 526.

To call such evidence relevant to the sex trafficking of "R.D.F." is to stretch the term beyond all recognition, and to permit its admission is to ignore entirely the plain import of Rule 403.

### b.    *Evidence Regarding The Robbery And Attempted Murder Of A Competitor.*

In addition to testifying about the murder of "El Pelon," Det. Hartlove was permitted to testify about the attempted robbery and murder of Hector Avila. JA 431, 434. He first was asked about a 911 call in connection with a purported robbery that Det. Hartlove testified was committed by Appellant Ventura. JA 431. He then was permitted to testify that the person that Appellant Ventura had falsely reported was involved in the robbery was a person named Freddy Soriano, allegedly a competitor of Ventura. JA 431. The detective then testified about an incident that occurred on November 3, 2010, where Hector Avila was the victim of a robbery or attempted robbery. JA 432. Det. Hartlove was then permitted to opine that Hector Avila was an associate of Freddy Soriano JA 432-433.

### 2. *Sanra Flores San Maron*

The second witness called by the Government described how she had provided temporary shelter to a prostitute and received threats from a male caller. Appellants objected to her testimony stating that

13

MR. RUTER: We're going to object, Your Honor, to any such references. It's our belief that it's not relevant. It's our belief that, under the statute for which Mr. Ventura stands charged, the threats have to be directed towards someone involved in the trade, such as the women themselves. A threat alleged to have been made to a third party who has nothing to do with the industry at all is not relevant to whether or not any of the elements of the offense are met, and it's extraordinarily prejudicial, needless to say, and, even collaterally, we don't see how it's relevant to the charges that are pending.

THE COURT: It is your understanding that the threat cannot be in furtherance of the trade?

MR. RUTER: Your Honor, it can be in furtherance, but it has to be in furtherance directed to someone who is involved in the trade. It's the way that we see it, and, if the Court disagrees, we would argue that that would not be in furtherance of the trade directed at a third party.

MS. YASSER: If I may, first of all, this is an overt act. This threatening call and this experience are actually overt acts charged in the conspiracy in this case, conspiracy, Count 1, in furtherance of the prostitution operation, and obviously evidence that Mr. Ventura placed threatening calls to witnesses who were perceived to have either called the police on him or were assisting his women after they needed help is evidence that they were, in fact -- that Ventura was, in fact, engaged in this trade.

THE COURT: So you're saying this was generally in pursuit of the business.

MS. YASSER: Absolutely.

THE COURT: -- this was done in?

MS. YASSER: This is to threaten –

THE COURT: The Government takes a different view of the restrictions on the threat, Mr. Ruter, and that will be, here, the prevailing view, but you do have your objection.

14

MR. RUTER: Thank you, Judge Quarles.

THE COURT: It is overruled.

JA 550-551.

Initially, Ms. Flores made clear that she had no idea about who had poured the gasoline in her building. JA 570. And again, there was no evidence linking this alleged conduct to any of the victims of sex trafficking, and not even the attempt to demonstrate even knowledge of this on their part, if any, let alone whatever effect it might ostensibly have had upon them. The district court revealed its lack of comprehension of this point in its reference to such conduct being "in furtherance of the trade," which is to say the prostitution enterprise, when what was required by the charged offenses was such violence or threats of same directed toward and abetting the sex trafficking of a victim. Indeed, it cannot even be stated that this was in furtherance of "the trade," in that it cannot be linked to the Appellants. *See Huddleston v. United States,* 485 U.S. 681, 689 (1988). *Huddleston* imposed an absolute requirement for admission of Rule 404(b) evidence of a showing that the defendant must have committed the alleged bad act, and that "unsubstantiated innuendo" is insufficient, *id.*, which is all the more problematic when it is remembered that Appellant Fuertes was acquitted of the murder of "El Pelon."

Ms. Maron was then permitted to testify that her husband received a call with

15

a telephone number associated with Appellant Ventura and that the person on the phone threatened "to do away with the whole family." JA 553. She was also permitted to, over the Appellants' objection, testify about incidents that occurred several days after the threatening phone call, which included gasoline being poured outside the witnesses door and vandalism to her vehicle. JA 560-561. She was able to provide no information as to the whether Mr. Ventura made or knew of this call, or whether it actually took place as, in a repetition of the error in Det. Hartlove's testimony, she had no relation to the telephone call in question.

### 3. Sgt. Jessica Kirchner

The third witness called by the Government was a law enforcement officer who discussed the search of several locations. JA 574-600. However, the Government was permitted to ask in one in the first series of questions addressed to Sgt. Kirchner that her involvement in the investigation began because she was "charged with supervising the investigation of the murder of Ricardo Humberto Rivas Ramirez ["El Pelon"] as well as the attempt[ed] murder of the female he was transporting at that time." JA 577.

16

### 4. *Carlos Alberto Herandez Campos*

The fifth witness[3] called by the Government to establish that "El Pelon" was a competitor of Appellant Ventura and that Appellant Ventura made a threatening statement and showed a firearm to Mr. Campos. JA 614-620. Mr. Campos was permitted to testify that Ricardo Humberto Rivas Ramirez was involved in prostitution in the Annapolis, Maryland area and that he knew Mr. Ramirez as "El Pelon." JA 617. Mr. Campos was permitted, over Appellants' objection, to testify that Appellant Ventura had come to him and said that he was having problems with Mr. Ramirez (a/k/a "El Pelon" or "Victor") and that Appellant Ventura, again over Appellants' objection, showed him a loaded firearm. JA 623-624. Mr. Campos testified that Appellant Fuertes was present during this meeting. Importantly, however, neither Appellant sought to have Mr. Campos relay any message to Mr. Ramirez nor were there any prostitutes present when this alleged discussion and showing of the firearm took place. JA 625.

The Government was then permitted to ask, again over objection, that Mr. Ramirez (a/k/a "El Pelon" and "Victor") was killed soon after this meeting with the Appellants. JA 626. He was then permitted to testify that the numbers he had for the

---

[3] The fourth witness was Cpl. Mark Cochran who made no mention of a murder investigation involving the Appellants or any threats or acts of violence against third parties.

17

Appellants were the same numbers given to Det. Hartlove by the surviving witness to the "El Pelon" murder, who also told him that the caller(s) from these numbers had threatened Ramirez/Campos him prior to his murder. JA 628. Mr. Campos was permitted to testify that Appellant Ventura had claimed responsibility for a shooting that occurred earlier, JA 672, although no other information was supplied about this. Again, there was no testimony that any prostitutes were present during this conversation or that such information was known among prostitutes involved in the offense. JA 614-630.

**5. *Maximilliano Zelaya Repalo***

The sixth witness called by the Government testified about working with the Appellants in the prostitution business. JA 678-765. He was, however, also permitted to testify, over objection, that Appellant Ventura had told him that he wanted to kill a competitor known as the "Dominican". JA 700-701. He was also permitted to testify to death threats that Appellant Ventura made to the "Dominican". JA 702. Mr. Repalo then testified, over objection, that Appellant Ventura had admitted to have having "killed another person before, something along those lines" and that he had seen Appellant Ventura possess a firearm. JA 702-703. Again, there was no testimony that any prostitutes were present during this conversation or that such information was known among prostitutes involved in the offense. *See*

18

*generally,* JA 678-765.

### 6.  Det.  Amy Miguez

The seventh witness called by the Government was Det.  Amy Miguez, who testified about searches of several locations. JA 766-798.  Again, however, the Government was able to establish through this witness that the defendants were suspects in the murder of "El Pelon" and his companion.  JA 771.  This was the case even though it does not appear that Det.  Miguez was actually involved in the murder investigation, nor that the searches were related.  Rather, the Government merely asked Det.  Miguez if she was "aware of an investigation involving the murder of a man named"El Pelon" …as well as the attempted murder of a woman [] that he was transporting at the time."  JA 771.  Were this not enough, government counsel was permitted to testify yet further about its theory of the case, by way of the following exchange.

> Q.  And were you also aware that that investigation included and morphed into a sex-trafficking investigation as well?
>
> A.  Yes, ma'am.

JA 771.

### 7.  Margarita Santiago Laona

The eighth witness called by the Government was a prostitute who was employed by Appellant Ventura.  Her testimony is not the basis of this Appeal.

Counsel brings it to the Court's attention because she is one of only two prostitutes who testified during the trial, and during her testimony she does not mention that she is aware of the murder of "El Pelon", threats made to the "Dominican," or any of the acts of violence or threats of violence that six of the first seven witnesses were permitted to describe. JA 797-845. She also was unable to identify Appellant Fuertes. JA 810.

## 8. *Carlos Ascencio*

The ninth witness called by the Government was Carlos Ascencio, another individual who had worked with Appellant Ventura in the prostitution business. JA 846-889. Mr. Ascencio, was permitted, over the Appellants' objection, to discuss robbing other brothels and that the murder of "El Pelon." JA 869-870.

Q. Did he ever talk to you about doing something about Juan?

A. Yes.

Q. What was that?

A. Well, he said that he was invading his territory. He was going to try to find a way to get him out of there, that he wanted to scare him so he would leave.

Q. Did he ever -- in talking about the Dominican, did he ever talk to you about something that had happened to another competitor?

A. Yes. A guy who was called Pelon.

Q. Did he tell you what happened to him?

20

A. Well, yes. He had mentioned to me that he had deliveries there in Annapolis, too, and an address had been asked – an address had asked for a girl to be delivered from, and, when they went, he was ambushed.

Q. Did he tell you what happened to Pelon?

A. Yes. That he was killed, and also they shot the girl he had with her -- with him.

Q. Did he ever talk about doing the same thing to Juan, the Dominican?

A. Yes. He said that, if he didn't leave there, the same thing would happen to him as what happened to Pelon.

Q. Mr. Ascencio, did Chino ever threaten you?

A. Well, he never threatened me, no, but he says -- what he says all the time is what you -- the person who owes, pays.

JA 870-871.

Mr. Ascencio was then asked if he ever observed Appellant Ventura with firearms and in response, he discussed the types of guns he observed Appellant Ventura possess, which, according to Mr. Ascencio, he possessed to rob other places of prostitution.  JA 871.  Again, there was no testimony elicited that these statements were made in the presence of prostitutes or that this was information generally known by prostitutes working with or for the Appellants.

### 9. Det. Richard Truitt

The tenth witness was called by the Government to describe the search of

21

locations and individuals. JA 890-909. Again, however, the Government was permitted to remind the jury that this involved a murder by asking first in a series of questions whether the witness "assist[ed] in the investigation that followed from the murder and attempted murder of Mr. Rivas Ramirez as well as [female victim] back in September 2008." JA 891. The marginal relevance of this testimony, as with that of Det,. Miguez, *supra*, cannot be compared with the prejudicial effect of the constant and intentional reminders to the jury that this case was less about sex trafficking and more about the murder of"El Pelon".

### 10. *Ferman Martinez*

The eleventh witness called by the Government described his work at a brothel for Appellant Ventura, but then was permitted to testify that Appellant Ventura had asked him to commit a murder. JA 923. Mr. Martinez testified that Appellant Ventura "asked him to do him a favor and to go execute somebody" who delivered for his competitor. JA 932. Mr. Martinez then testified about how Appellant Ventura had arranged for him to have a shotgun and that when he confronted the person for whom Appellant Ventura wanted executed he stated that "when it came to time for me execute the guy, I didn't have any bullets. I actually pulled the trigger to bust his head up, but I didn't have bullets." JA 934. Again, there was no mention that any of this was commonly known by the prostitutes who worked with or for Appellant

Ventura or that any prostitutes were present during this conversation or planning. JA 910-1014. Rather, it is merely evidence that Appellant Ventura conspired with Mr. Martinez to commit a murder, but, even so, could not pass the relevance threshold. By the very terms of the testimony itself, the testimony clearly could not be related to the murder of "El Pelon", who did not "deliver" for a competitor, rather who was a competitor himself. This plainly served as no more than negative character evidence, as with so much of the other, similar evidence presented by the government. *See* F.R.E. 404(b).

## 11. *Hector Avila*

The twelfth witness called by the Government described how he worked for a competitor to Appellant Ventura, how Appellant Ventura had threatened him in the past and describes the incident where Ferman Martinez had tried to kill him during a robbery attempt. JA 1044-1046. Over Appellants' objection, Mr. Avila was permitted to testify that Appellant Ventura had threatened to "come after" him and that "same thing that happened to Pelon was going to happen to" him. JA 1050. Mr. Avila was also permitted to testify that "El Pelon" was in the business of prostitution at the time he was killed. JA 1051. Mr. Avila was then able to testify about an attempt by Appellant Ventura to get protection money from him so that Mr. Avila could continue to work in the prostitution business. JA 1070. There was testimony

23

that Appellant Ventura threatened an unidentified prostitute, but there was no testimony that the Appellant's threats to Mr. Avila or the attempted murder was ever known by any prostitute.  JA 1056-1058.

## 12.   Josh Burnett, Joong Kim, Antonia Garcia, Ginger Duva and Det.  Jose Chinchilla

The thirteenth witness called by the Government testified about recovering the shotgun used in the attempted murder of Hector Avila., but did not in any way relate this to Mr. Ventura.   JA 1133-1136.  Witnesses,  Kim, Garcia and Duva made no mention of threats of violence or acts of violence of the Appellants, and their testimony takes up less than 30 pages.  JA 1138-1165.  Det.  Jose Chinchilla, the seventeenth witness, was called to relate a time when Appellant Ventura made threatening phone calls to him when he thought he was a competitor.  JA 1168-1169. No link was drawn between any of this evidence and any victim of sex trafficking.

## 13.   Esmirna Duenas Franco ("R.D.F.")

The eighteenth witness called by the Government was a prostitute employed by Appellant Ventura, and who had had a romantic relationship with Ventura .  She described the relationship with him as "perfect," JA 1185, until she learned he was married with children. JA 1351-1352.  Although most of her testimony was not objectionable, including testimony of threats made to her and acts of violence made to her or against other prostitutes, Ms. Duenas was permitted to testify about the

24

murder of "El Pelon." Importantly, the testimony was not offered to demonstrate how the knowledge of this murder had on her state of mind, but rather was offered to prove that the Appellants had actually committed the murder. For example, Ms. Duenas testified that she had seen both the Appellants soon after the murder of "El Pelon" and that they were celebrating for having "met their objective" in the death of "El Pelon". JA 1206. Ms. Franco was then permitted to testify:

> Q. And did you notice anything about the clothing of either two of these individuals?
>
> A. Yes.
>
> Q. What did you notice?
>
> A. They had blood on them.
>
> Q. And had blood on them?
>
> A. Flaco.
>
> Q. Ms. Dueñas, did you see a weapon that evening?
>
> A. Yes.
>
> Q. What did you see?
>
> A. I saw a black automatic weapon.

JA 1206.

Ms. Duenas was never asked how the knowledge of this murder, and the involvement of the Appellants in it made her act with regard to her work as a

25

prostitute with and for the Appellants.  This is perhaps unsurprising, as Ms. Duenas spoke with the police repeatedly in the time after"El Pelon"'s murder in September, 2008, but only came up with this story about the blood in May of 2011, two and one-half years later, and subsequent even to her appearance before the grand jury in December, 2010.  JA 1356-1363.  It is perhaps more telling to consider Ms. Duenas response to an inquiry *by government counsel* about Appellant Fuertes, the person who apparently had been involved in the murder of "El Pelon," bloody clothing and all.

Q.  With respect to Defendant Fuertes, Flaco, did you feel afraid of him?

A.  No, not of him.

JA 1228.

## 14.  Expert Testimony Regarding Injuries to Ms. Duenas.

Immediately after Ms. Duenas' testimony, the Government called Dr. Mary-Theresa Baker as an expert in the area of forensic medical examinations with respect to cutaneous findings.  JA 1389.  Dr. Baker's background was in the forensic collection of evidence in alleged cases of child abuse, JA 1381, and she was board-certified in pediatric and adolescent medicine, with a sub-board certification for child abuse pediatrics.  JA 1384.  She was not a dermatologist, nor was she qualified or experienced in the field which her testimony covered.  With respect to "cutaneous

26

findings" or scars, Dr. Baker said that the time frame for determining when a scar was formed was limited to less than six months. JA 1388-1392. After six months, a scar is final and it is not possible to date the time the scar was made  JA 1388-1392. Moreover, for her experience, of the 3000 exams she estimated she had completed, only 20 involved patients older than 18. JA 1395. Dr. Baker testified that the basis for determining the cause of the scar came from the examinee, not from any medical or scientific testing. JA 1392.

Appellants objected to the admission of Dr. Baker as an expert witness arguing that first, she was not qualified to provide testimony about cutaneous findings in an adult, since 99.33% of all her examinations were of children under 18, that her testimony could provide no diagnosis or medical opinion, rather that it would serve merely to regurgitate what Ms. Duenas had told her, which would be merely opining on the truthfulness of what Ms. Duenas had said to her and thus was impermissible vouching. JA 1396-1398. The district court concluded such arguments went to weight and not admissibility and permitted Dr. Baker to testify. JA 1398.

Dr. Baker was asked about four scars on Ms. Duenas and was asked whether the scars were consistent with what Ms. Duenas had told her were the source of the scars. JA 1400-1410. For each scar, Dr. Baker was asked if what Ms. Duenas described as the cause of the scar was consistent with her own observation,

27

notwithstanding her prior testimony that she could not offer any more than a view as to the age – not the cause – of the scars.  JA 1400-1410.  Dr. Baker was not asked to form a medical opinion regarding any examination or diagnosis.  *Id.*  The Appellants renewed their objection to the inclusion of Dr. Baker's testimony because she provide no "expert testimony" and thus the jury should not be instructed on her testimony constituting expert opinion testimony. JA 1425.  The district court rejected this view, and gave the instruction on expert witness testimony.

## II.  Sex Trafficking In Count 6 And Use Or Possession Of A Firearm During A Crime  Of Violence As Charged In Count 7

Count 6 charged  Appellants with knowingly recruiting, enticing, harboring, transporting "R.D.F." and receiving a financial benefit from participation in a venture that engaged in acts knowing that "force, fraud, and coercion" would cause "R.D.F." to engage in a commercial sex act.  JA 47.  Count 7 charged Appellant Ventura with the use or possession of a firearm in furtherance of a "crime of violence…that is, sex trafficking in violation of 18 USC § 1591(a), as alleged in Count Six."  JA 48.

Appellants objected to the inclusion of "fraud" as a basis for a violation of 18 USC § 1591, but the Government wanted to include "fraud" as a basis for violating 18 USC § 1591 stating all "three predicates of force, fraud or coercion …alone can support a finding of guilt." JA 1017-1018.  The Government went on to note that the

use of "force" need not be violent force but include acts of "power or pressure which do not have physical components." JA 1018.

The jury was instructed that with respect to the second element of the 18 USC § 1591(a) offense the Government "must prove beyond a reasonable doubt [] that the Defendant knew that force, fraud or coercion would be used with respect to Esmirna Rebeca Duenas Franco." JA 1494. The district court went on to explain that fraud "means that the Defendant knowingly made a misstatement or omission of a material fact[.]" JA 1494.

At the conclusion of the evidence, Appellants made motions for judgment of acquittal on all counts, renewing same after the defense rested, all of which were denied. The verdict forms make no election as to which method of committing 18 USC § 1591 each Appellant could be found guilty of, whether by force, fraud, coercion, or some combination of these. JA 1508, 1510.

## SUMMARY OF THE ARGUMENTS

1.  The district court admitted, over objection, irrelevant evidence of threats directed toward others, allegedly by Appellants but not so proven, including permitting the government to attempt to prove an uncharged murder of an alleged competitor of Appellant Ventura.  This evidence, which predominated during the entirety of the government's case-in-chief, failed to meet the requirements of F.R.Ev. 401 and 403, as it did not serve to prove the crimes charged, which required the direction of force, fraud and coercion towards the victims of the sex trafficking offenses.

2.  The district court erred when it permitted a doctor to be qualified as an expert and to testify as to her opinions, when her testimony did not constitute the application of her knowledge in accordance with Daubert, rather it served only to opine on the truthfulness of the primary government witness.

3.  Appellant Ventura could not have been found guilty of the possession or use of a firearm relative to a crime of violence, as the charged offense of sex trafficking cannot constitute a crime of violence, pursuant to the Supreme Court's holding in *Descamps v. United States.*

4.  There was insufficient evidence to find Appellant Fuertes guilty of sex trafficking of "R.D.F." by force, fraud and coercion, in that he was acquitted of all conduct prior to December 23, 2008, and there was but a single incident of violence directed toward her after that date of which he was even ostensibly aware.

30

# ARGUMENT

## I.   THE DISTRICT COURT ERRED IN DENYING THE APPELLANTS' MOTION TO PRECLUDE EVIDENCE OF VIOLENT ACTS OR THREATS MADE TO INDIVIDUALS WHO WERE NOT VICTIMS OF THE CHARGED SEX TRAFFICKING OFFENSE.

### *Standard of Review*

This Court reviews a district court's decision to admit or exclude evidence for abuse of discretion.  *See United States v. Forrest,* 429 F.3d 73, 79 (4th Cir. 2005). Pursuant to this standard, this Court may not substitute its judgment for that of the district court, but rather this Court must determine whether the district court's exercise of discretion, considering the law and facts, was arbitrary or capricious. *See United States v. Mason,* 52 F.3d 1286, 1289 (4th Cir. 1995).  Moreover, any error in the admission or exclusion of evidence is subject to the harmless error test.  *See Delaware v. Van Arsdall,* 475 U.S. 673, 680-84 (1983).

### A.  *Evidence Of Acts Against Other Third Parties Was Not Relevant Under Rule 401 Because Such Facts Had No Consequence In Determining The Action.*

The district court erred because it permitted the government to present evidence, for the truth, that one or both Appellants participated in a murder and an attempted murder, when neither offense was relevant to the charged conduct. Appellant Ventura was never charged with murder, nor was he charged with

31

attempted robbery, and neither offense makes it more likely that he actually committed the offenses for which he was actually charged. Therefore, the only purpose for presenting this evidence was to persuade the jury that the Appellants are very bad people who must therefore have done these other bad things alleged by the Government.

Count 1 of the conspiracy charged Appellant Ventura with making an illegal agreement to transport or entice individuals into prostitution. JA 35. Counts 2, 4 and 5 charged the Appellants (in Count 2) and Appellant Ventura specifically (in Counts 4 and 5) with transporting an individual across state lines for the purpose of prostitution. Count 3 charged Appellant Ventura with coercing or enticing an individual to engage in prostitution. Count 6 charged the Appellants with using threats, fraud or coercion against "R.D.F" and Count 7 charged Appellant Ventura with using a firearm in furtherance of Count 6.

In none of these charges is there any an element that the Appellants used force or threats of force against those who were **not** prostitutes. The prostitutes could have testified that they had heard that the Appellants had committed such acts and that it created an environment where **they** felt coerced. *United States v. Harris*, 701 F.2d 1095, 1100 (4th Cir. 1983) (laborer testified that he observed abuse of others); *United States v. Booker* (4th Cir. 1981) (laborers testified about the abuse they suffered at the

hands of the defendants). Here, however, the Government avoided that evidence, to the unknown extent to which it even existed, and put forward in its place, with the permission of the district court, direct evidence that Appellants committed one murder, admitted to another, and then commissioned the attempted murder of a third person. JA 231-236, 252-261, 431-434, 700-703, 870-871, 910-942, 1039-1072, 1206-1207. In addition, the Government was permitted to present direct evidence that the Appellants had threatened and terrorized a family who had provided shelter to a prostitute after her arrest. JA 543-562. Importantly, there was no evidence presented that any of the prostitutes who did testify that they know of this and as a result felt that this created a coercive environment, and only one prostitute testified that she was even aware of the murder.

Federal Rule of Evidence 401 defines relevant evidence as having two related and required components.

> 1) it has any tendency to make a fact more or less probable than it would be without the evidence; and

> 2) the fact is of consequence in determining the action.

Obviously, evidence that Appellants are murderers and robbers certainly makes it more "probable" that they committed the other acts alleged by the Government, but such evidence is not "of consequence in determining the action." The Supreme Court has interpreted relevant evidence as evidence that has "bearing on the issue of guilt

33

or innocence" of the offense charged. *Bruton v. United States,* 391 U.S. 123, 131 n. 6 (1968) (stating that "[a]n important element of a fair trial is that ***a jury consider only relevant and competent evidence bearing on the issue of guilt or innocence***.") (emphasis added). Specifically, "the law does not allow consideration of other crimes as evidence of a defendant's criminal disposition." *United States v. Foutz,* 540 F.2d 733, 736 (4th Cir.1976). Evidence must go to the state of mind at issue. *United States v. Zayyad,* 741 F.3d 452, 460 (4th Cir. 2014) (upholding a district court's denial of the defendant's cross examination on a particular topic) (*citing United States v. Curtis,* 782 F.2d 593, 599 (6th Cir.1986) "Unless there is a connection between the external facts and the defendant's state of mind, the evidence of the external facts is not relevant.")

Here the Government was permitted, over Appellants' objection, to present evidence that the Appellants were suspects in a murder where the person, "El Pelon," was killed execution-style with seven shots to the back of the head. JA 102. The Government was permitted to present evidence that phone numbers of individuals who allegedly threatened "El Pelon" were used and operated by the Appellants. JA 235-236, 245, 252-256, 259-260. Moreover, the Government was permitted to present direct evidence that on the night of the murder, the Appellants had a gun and bloody clothing and were celebrating the meeting of their "objective." JA 1206. The

Government was also able to present evidence through numerous witnesses that Appellant Ventura had wanted to kill the murder victim. JA 622-627, 700-701, 870, 1204. None of this evidence was presented to show the impact on those who worked as prostitutes with or for the Appellants, as no evidence was adduced which suggested any knowledge of, let alone effect upon, any victim of sex trafficking. This constituted solely and entirely an attempt to establish that the Appellants had killed another person.

However, murder is not an element at issue in the crimes charged. Here, the state of mind at issue, with respect to Count 1, is whether or not the Appellants knowingly and willfully conspired to transport prostitutes across state lines or enticed prostitutes to engage in prostitution. *See generally,* 18 USC § 371. The state of mind required for counts 2 through 5 is similar – whether the Appellants knowingly transported an individual across state lines for the purpose of prostitution or knowingly enticed them to engage in prostitution. *See* 18 USC § 2421 ("whoever knowingly transports"); 18 USC § 2422(a) ("whoever knowingly persuades, induces, entices or coerces").

Count 6 does allege an offense of sex trafficking by force, fraud or coercion and Count 7 does allege that Appellant Ventura possessed a firearm in furtherance of that offense. *See* 18 USC § 1591, 924( c). However, the state of mind in that offense

35

is whether the Appellant Ventura did in fact threaten, coerce or commit fraud against "R.D.F." If the evidence introduced was what "R.D.F." knew and thought about acts or threats of violence committed by the Appellants, such evidence would be relevant but would be limited to what she knew, thought or believed – as a result of the force, fraud and coercion –  not what the Appellants actually did.

Whether or not the evidence shows the Appellants did, in fact kill "El Pelon" is irrelevant to the offenses charged.  Whether or not the evidence shows that the Appellants did, in fact, try and have another person kill a competitor is irrelevant. Whether or not the evidence shows that the Appellants did, in fact, threaten and terrorize a family is irrelevant.  None of these acts make it more likely that the Appellants conspired to transport or entice prostitutes as required by 18 USC § 371. None of these acts make it more likely that the Appellants transported prostitutes across state lines as required by 18 USC § 2421.  None of these acts make it more likely that the Appellants enticed any prostitutes to engage in prostitution as required by 18 USC § 2422.  Moreover, the fact that Appellants may have committed all of these acts, does not show that "R.D.F." felt forced or coerced to engage in prostitution, or was the victim of fraud to do so, as required by 18 USC § 1591(a). Evidence that she was aware of facts such as these may be relevant to a charge in 18 USC § 1591(a), but such acts must either be directed against the individual or against

36

others of whom she is aware, which creates such an atmosphere. What the Rules of Evidence do not permit is an unrelated, parallel prosecution for murder and attempted murder of individuals not related to the offense charged, which involves fully half of the witness testimony presented in the trial.

The Government and the district court appeared to believe that because such acts are charged in the indictment, the Appellants have no right to contest such evidence as being irrelevant. JA 119, 231-233, 550. However, the Appellants properly contested the evidence as surplusage in their motion when they argued that evidence of threats or acts of violence that were not directed at prostitutes is not relevant to the offense charged. JA 49. The district court concluded that such evidence was admissible because the "indictment allege[s] that Fuertes and Ventura threatened competitor 'pimps' to ensure the success of their own prostitution business." JA 115, 231-233, 550 (denying Appellants renewed objections).

The mere fact that such acts are included in the indictment does not automatically make such evidence relevant or admissible. Upon motion of the defendant, a district court may "strike surplusage from the indictment or information when it is both irrelevant (or immaterial) and prejudicial." *United States v. Hedgepeth,* 434 F.3d 609, 612 (3d Cir. 2006); *see also* F.R.Cr. P. 7. Although denying a defense motion arguing that the information that the Government sought

to introduce was both irrelevant and prejudicial, the district court never analyzed whether such facts as alleged in the indictment were relevant to the offense charged. Rather, the district court merely assumed that because the information was in the indictment, it had no power to limit the government's introduction of evidence on relevancy grounds. *See* JA 115.

In upholding the inclusion of similar testimony, this Court has been clear that the evidence must be directly related to a fact at issue. In *United States v. Williams*, 445 F.3d 724, 733 (4th Cir. 2006) this Court upheld the introduction of evidence of a murder for a defendant charged with felon in possession. In *Williams*, the case involved the murder of a woman to steal her money. *Id.* However, without jurisdiction for the murder, the Government charged the defendant with being a felon in possession of a firearm. *Id.* The proof of that the firearm was possessed was the evidence of the murder committed by the defendant with the firearm . *Id.* As such, the evidence of the murder with the firearm was directly relevant to the offense charged – that the defendant possessed the firearm. *Id.* at 731. Similarly, in *United States v. Myers,* 280 F.3d 407, 413-14 (4th Cir. 2002), this Court held that evidence of a murder in a case alleging a felon in possession was relevant to the offense charged because it provided evidence of whether the defendant possessed the firearm. There the Court found that the issue of the murder was "directly relevant to whether

38

Myers was a felon in possession of a firearm[.]"  Here, unlike in *Williams* and *Myers,* proof of murders and attempted murder provide no direct link to any of the charged offenses.

Such evidence is not relevant to Count 7, firearm in possession of a crime of violence because, as discussed below, Count 6 as charged is not a crime of violence. However, even if it is properly a crime of violence, evidence of the murder of "El Pelon" provided by people *other* than "R.D.F" is inadmissible since the relevant issue in Count 7 is whether Appellant Ventura used or possessed a firearm in furtherance of his threats, coercion or fraud ***toward*** "R.D.F." to engage her in prostitution.  JA 35. The fact that there may be evidence that he was involved in the killing of "El Pelon" is irrelevant to that issue.  Moreover, "R.D.F." made no statement about the attempted murder of Hector Avila or the threats and acts against the woman who took in the prostitute after she was arrested – and thus that evidence is irrelevant to those charges as well.

> ### B.  Even If Admissible Under Rule 401, Such Evidence Is Clearly More Prejudicial Than Probative And The District Court Abuses Its Discretion By Permitting The Government To Include Evidence Of Murder, Attempted Murder And Acts Of Threats To Third Parties.

Even if this Court concludes that the evidence meets the admittedly low bar for admission under F.R.Ev. 401, such evidence should have been precluded from being admitted due to its prejudicial effect, under F.R.Ev.  403.  Rule 403 limits even

39

relevant evidence where the probative value of the evidence is substantially outweighed by the danger in unfairly prejudicing the defendant or misleading the jury. F.R.Ev. 403. The Rule states, in full, that:

> The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

F.R.Ev. 403

As such, evidence that may be relevant and admissible should still be excluded if the probative value of the evidence is substantially outweighed by some other harm such as unfair prejudice, confusing the issue, or misleading the jury. *Id. United States v. Tedder,* 801 F.3d 1437, 1444 (4th Cir. 1896) (even if otherwise admissible, evidence may be excluded if the "risk that the jury will be excited to irrational behavior is disproportionate to the probative value of the evidence." In considering Rule 403 challenges, the Fourth Circuit attributes great weight to the curative power of the cautionary jury instruction. *See e.g., United States v. Van Metre, 150* F.3d 339, 351-53 (4th Cir. 1998); *United States v. Queen*, 132 F.3d 991, 997-98 (4th Cir. 1997).

According to the Government, the probative value of the evidence of murder, attempted murder and threats is that "[e]vidence that the defendants engaged in a complaint to eliminate, through threats of violence and actual violence, those participating in prostitution in the same area … makes it more probable that the

40

defendants themselves were in fact participating in the charged conduct."  JA 155.
Such evidence is, according to the Government, evidence of "their own participation in that very trade."  JA 155.

However, Appellants were not charged with being involved in the "trade" of prostitution.  There is no charged offense under 18 USC § 1961 where the defendants are engaged in an "enterprise" of prostitution, nor is it an element of § 1591 that there be an ongoing course of conduct.  The offense requires no more than, and was charged as, the sex trafficking of a single individual, "R.D.F."  Moreover, even *if* the acts of violence and threats of violence could be attributed to their involvement in the prostitution business, there is no connection to the elements to the offense charged.  The elimination of competitors did not have any impact on the interstate transportation of prostitutes.  It is not as if the competitor made it difficult to cross state lines and thus the elimination of the competitor made it easier to commit the crime.  Moreover, the elimination of competitors did not make any impact on the recruitment of prostitutes.  The admitted purpose of the alleged killings was to eliminate competition for *customers*, not in obtaining the service of prostitutes.  As such, any relevance is tangentially limited to the actual crime charged, and this makes the probative value of the evidence very limited.

Here, the limited value of the evidence is clearly outweighed by the danger it

41

caused with the jury. First, devoting the majority of a case on transportation and recruitment of prostitutes to a particular unrelated murder, and attempted murder of a competitor clearly served to confuse the jury. The jury was presented evidence that the Appellants were directly responsible for the murder and an attempted murder of another and yet were expected only to deliberate about whether the Appellants had transported individuals across state lines for the purpose of prostitution, encouraged individuals to join their prostitution services, or whether "R.D.F" was threatened, coerced or defrauded in engaging in prostitution. JA 35. Evidence of the murder and attempted murder had nothing to do with the charged conduct, and thus the jury was misled into believing that the case involved a homicide as opposed to the transport and recruitment of prostitutes. Secondly, permitting such evidence was incredibly prejudicial to the Appellants who, when faced with evidence of actual homicide, had no hope of obtaining a fair trial on that with which they were actually charged.

### C.  Introduction Of Evidence Of Violence And Threats Of Violence Was Not Harmless.

Improperly admitted evidence is subject to review for harmless error under F. R.Cr.P. 52(a) and will be found harmless if the reviewing court can conclude that "without stripping the erroneous action from the whole, the judgment was not substantially swayed by the error." *United States v. Abu Ali,* 528 F.3d 210, 231 (4th Cir. 2008) (*citing Kotteakos v. United States,* 328 U.S. 750, 765 (1946)). "The

question is not [whether the jury was correct in it's] judgment, regardless of the error or its effect upon the verdict [but rather] what effect the error had or reasonably may be taken to have had upon the jury's decision." *Kotteakos,* 328 U.S. at 763. As such, if the error had "substantial influence" over the proceeding, the "conviction cannot stand." *Id.* at 765.

Here the error had substantial influence over the trial. Out of the twenty witnesses called by the Government, thirteen made some reference to the murder investigation, murder, attempted murder or threats directed against non-prostitutes. This is not a case in which an inadvertent or fleeting mention of some inflammatory evidences was alluded to in passing. Rather, the evidence went the other direction. The Government did not just make mention of the evidence, it actually attempted to prove the underlying offenses were committed and committed by the Appellants, linking very nearly every witness, including every law enforcement witness, to the investigation of the murder – rather than that of sex trafficking. The Government called three witnesses to discuss the attempted murder of Hector Avila alone, including Mr. Avila himself. JA 625, 700, 871, 923, 933-940, 1050-1067. The Government went further to call the person who actually found the weapon, which nonetheless was not linked to any of the alleged perpetrators by any forensic evidence. JA 1133-1137.

43

Virtually every police witness made sure to make it known that the real purpose of their investigation was the homicide of "El Pelon", and the Government was permitted to present evidence that a non-testifying witness had identified telephone numbers from which callers had made threats to the murder victim before his death, and then promptly linked those numbers to the Appellants. JA 231-232, 252-261, 577, 771, 891.

One witness the government did not call, and apparently had never located, was the other victim of the shooting which killed "El Pelon," Nancy Marin Ayala, who had been in the car with him when he was killed. Called by the defense at Appellant Fuertes' sentencing, Ms. Ayala took the stand and affirmatively stated that he was not the man in the car that night, and had not participated in the shootings. JA 1751. While the government attempted to shake her firm testimony, it was unsuccessful. JA 1749-1758.

Appellant Fuertes went to trial for the murder of "El Pelon" on May 5, 2014, in the Circuit Court for Anne Arundel County, Maryland, case number 02K12001892. After a ten day trial, the jury began deliberations on May 16, and returned a verdict of not guilty one all charges.

The error of including this evidence infected every aspect of the Government's case against the Appellants and it is not possible for any reviewing Court to conclude

that this inflammatory, irrelevant or marginally relevant evidence did not influence the jury's deliberations, thereby denying Appellants a fair trial.

## II. THE DISTRICT COURT ERRED BY PERMITTING DR. MARY-THERESA BAKER TO TESTIFY AS AN EXPERT SINCE SHE PROVIDED NO EXPERT TESTIMONY AND HER TESTIMONY SERVED SOLELY TO OFFER AN OPINION ON THE TRUTHFULNESS OF THE GOVERNMENT'S MAIN WITNESS.

### *Standard of Review*

This Court noted in *United States v. Garcia,* — F.3d —, 2014 WL 1924857 at *5,* that it will "review a district court's decision to qualify an expert witness, as well as the admission of such testimony, for abuse of discretion." *United States v. Wilson,* 484 F.3d 267, 273 (4th Cir .2007). "A court abuses its discretion if its decision is 'guided by erroneous legal principles' or 'rests upon a clearly erroneous factual finding.'" *United States v. McLean,* 715 F.3d 129, 142 (4th Cir.2013), *quoting United States v. Johnson,* 617 F.3d 286, 292 (4th Cir.2010).

### *A. The district court abused its discretion in qualifying Dr. Baker to testify about R.D.F.'s injuries, for her testimony merely recapitulated what R.D.F. had told her, and by her own admission could not be founded upon any expertise.*

Rule 702 of the Federal Rules of Evidence permits a witness to testify as an expert if:

> (a) the expert's scientific, technical, or other specialized knowledge will

45

help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

( c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

When expert testimony is of a scientific nature, such as medical testimony at issue here, the trial court "must ensure that the [testimony] is not only relevant, but [also] reliable." *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589 (1993). Moreover, the evidence must help the jury determine a fact in issue. F.R.Ev. 702(a). This "helpfulness requirement" is to prohibit the use of expert testimony related to matters which are "obviously ... within the common knowledge of jurors." *Scott v. Sears Roebuck & Co.,* 789 F.2d 1052, 1055 (4th Cir.1986).

As such, the district court must first "determine at the outset whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. *United States v. Benally,* 541 F.3d 990 (10th Cir. 2008). The assessment of whether a witness has told the truth is "usually within the jury's exclusive purview." *United States v. Dorsey,* 45 F.3d 809, 815 (4th Cir.1995). "Thus, in the absence of unusual circumstances, Rule 702 renders inadmissible expert testimony on issues of witness credibility." *United States v.*

*Lespier,* 725 F.3d 437, 449 (4th Cir. 2013) *cert. denied,* 134 S. Ct. 974 (2014).

Thus, to have been admissible, Dr. Baker's testimony must have proved something other than the likelihood that the victim was credible, and she must base her testimony on the knowledge, training, experience or skill that permitted her to testify in the form of an opinion, supported by sufficient facts with a method that is reliable and that were applied to the facts of this case. F.R.Ev. 702; *Daubert,* 509 U.S. at 589.

Here, however, Dr. Baker's testimony fails on all fronts. Dr. Baker admitted that there is no way to determine the age of a scar once six months have passed. JA1388. Thus, her testimony was not helpful for a jury to determine that a particular injury occurred within the time frame at issue, since it had been more than two years since the alleged infliction by Appellant Ventura of the latest of the injuries, JA 1400-1410, which likewise could have resulted from injuries Ms. Duenas admitted she had suffered during her trip through mountainous terrain into the United States, JA 1158. Moreover, Dr. Baker's training and experience were not in the formation and treatment of adult scars, but rather in juveniles, and her experience was almost entirely with juveniles. JA 1395 (but 20 adults out of her 3000 cases meant that 99.33% of her cases involved only juveniles).

What makes Dr. Baker's testimony more problematic is that she did not provide

a *medical* opinion. Rather, she was asked whether what the victim told her about the cause of the injury was consistent with the injury she observed. And all Dr. Baker could testify to was that a particular injury was "sharp" and consistent with what the victim had told her. JA 1407-1410. There was no medical diagnosis, or application of a specialized skill or knowledge that would assist the trier of fact. Rather, her testimony was merely providing her opinion that the victim was telling the truth, and this was an improper subject for opinion testimony.

### B.  Introduction Of Expert Testimony Which Improperly Bolstered The Truthfulness Of "R.D.F." Was Not Harmless.

Counts 6 and 7 rested on the credibility of Ms. Duenas, the victim "R.D.F.," as a witness. Clearly, the Government was concerned about her reliability and believability as a witness, and it took considerable steps to try and corroborate her testimony as much as possible, including going to her former place of work and obtaining a picture of her. Here, the Government was permitted, over Appellants's objection, to present evidence that what "R.D.F." said was truthful and thus her reliability was bolstered by a medical doctor who was identified as an expert witness and was permitted to opine on no more than her credibility. Given Ms. Duenas status and testimony, it is clear that her testimony impacted the jury's credibility determination of Ms. Duenas and impacted upon the jury's determination for Counts 6 and 7.

48

### III. THE DISTRICT COURT ERRED BY NOT GRANTING APPELLANT VENTURA'S MOTION FOR JUDGMENT OF ACQUITTAL WITH RESPECT TO COUNT 7, SINCE 18 USC § 1591 IS NOT CATEGORICALLY A CRIME OF VIOLENCE.

**Standard of Review**

This Court reviews *de novo* a district court's ruling on a motion for judgment of acquittal. *United States v. Romer,* 148 F.3d 359, 364 (4th Cir. 1998). Considering the evidence in the light most favorable to the government, the Court must determine whether a rational jury could have found the essential elements of the crime beyond a reasonable doubt. *United States v. Tresvant,* 677 F.2d 1018, 1021 (4th Cir. 1982); *United States v. Bynum,* 604 F.3d 161 (4th Cir. 2010). A jury verdict will be sustained if there is "substantial evidence" to support it. *Glasser v. United States,* 315 U.S. 60, 80 (1942). "Substantial evidence is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *United States v. Young,* 609 F.3d 348, 355 (4th Cir. 2010). In determining whether there is substantial evidence, the court should allow the government "all reasonable inferences that could be drawn in its favor.*" United States v. Harvey,* 532 F.3d 326, 333 (4th Cir. 2008). If the record demonstrates a lack of evidence from which a jury could find guilt beyond a reasonable doubt, the appeals court shall reverse the conviction and order entry of a judgment of acquittal. *See United States v. Lowe,* 65 F.3d 1137, 1142 (4th Cir. 1995) *Jackson v. Virginia,* 443

49

U.S. 307, 317 (1979) ("[A] properly instructed jury may occasionally convict even when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt . . . . In a federal trial, such an occurrence has traditionally been deemed to require reversal of the conviction."); *Ortega-Rodriguez v. United States,* 507 U.S. 234, 249 (1993) ("In the class of appeals premised on insufficiency of the evidence, . . . retrial is not permitted in the event of reversal."

**Argument**

Under the analysis articulated in *Descamps v. United States,* — U.S. —, 133 S.Ct. 2276, 2286-7 (2013), 18 USC § 1591(a) cannot be considered a crime of violence,  and there cannot be a valid conviction for possessing a firearm in furtherance of such a crime as found in count 7.  Because the elements of 18 USC § 1591 make it possible to commit the offense in a non-violent way, the offense cannot be the basis for a valid conviction under 18 USC § 924( c), because it is possible to commit the offense without "violent physical force."   For there to be a valid conviction under Count 7, possession of a firearm in furtherance of a crime of violence in violation 18 USC § 924( c), there must be an underlying crime of violence.  18 USC § 924( c) makes it a crime when:

> Any person who, ***during and in relation to any crime of violence*** or drug trafficking crime (including a crime of violence or drug trafficking crime that provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which the person may

be prosecuted in a court of the United States, uses or carries a firearm, or *who, in furtherance of any such crime, possesses a firearm*, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime—

(I) be sentenced to a term of imprisonment of not less than 5 years;

18 USC § 924.

A "crime of violence" is defined as an offense that is a felony and—

(A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

(B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

18 USC § 924.

"Physical force" as used in 18 USC § 924 "means violent force—i.e., force capable of causing physical pain or injury to another person." *Johnson v. United States,* 559 U.S. 133, 134 (2010). As such, in order for there to be a valid conviction under 18 USC § 924(c) there must be an "element" of "violent force capable of causing physical pain or injury to another or the nature of the offense must have a substantial risk that violent physical force against another person or property." *Id.*

In determining whether an offense is a crime of violence, the issue is not *whether* the defendant committed the underlying offense in a violent way, but whether the offense as defined by the statute is one that is violent. *Begay v. United*

51

*States,* 553 U.S. 137, 141 (2008) ("In determining whether [a crime] is a violent felony, we consider the offense generically, that is to say, we examine it in terms of how the law defines the offense and not in terms of how an individual offender might have committed it on a particular occasion.").  Under this test, sex trafficking as proscribed by 18 USC § 1591 cannot be understood as a crime of violence.  The offense is defined as where a defendant knowingly

> (1) in or affecting interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States, recruits, entices, harbors, transports, provides, obtains, or maintains by any means a person; or

> (2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1),

> knowing, or in reckless disregard of the fact, ***that means of force, threats of force, fraud, coercion*** described in subsection (e)(2),or any combination of such means will be used to cause the person to engage in a commercial sex act.

18 USC § 1591(a) (emphasis supplied)

Importantly, the element "force, threats of force, fraud, coercion" is non-divisible.  As such, the jury could conclude that the Appellant used force, or threats, or fraud or coercion or a combination of one or more of them.  There is no requirement that the jury conclude one method or the other.  Where the conviction can be committed in a non-violent way and the elements are, as here, indivisible, the

52

analysis ends and the conviction cannot be used. *Descamps v. United States,* 133

S.Ct. at 2286-7 (because the elements of the offense do not establish a predicate

offense, it cannot be the basis of a predicate offense. "Whether the [defendant

actually did commit the predicate offense] makes no difference." Moreover, the fact

that the defendant may have even have admitted to the predicate offense, "is

irrelevant.")

Here, the element 18 USC § 1591 provides alternative but indivisible ways to

commit the offense, many of which are nonviolent means. A defendant can commit

the offense by way of fraud[4] or coercion.[5] Each of these methods do not require that

_____

[4]

 At trial, the jury was instructed with respect to the element on the use of fraud, force
or coercion as follows:

"The second element of this offense which the Government must prove beyond a
reasonable doubt is that the Defendant knew that force, fraud, or coercion would be
used with respect to Esmirna Rebeca Dueñas Franco.

Fraud, as I just used that term, means that ***the Defendant knowingly made a
misstatement or omission of a material fact*** to entice Ms. Franco. A material fact is
one which would reasonably be expected to be of concern to a reasonable person in
relying upon the representation or statement in making a decision." JA 1494.


[5] The jury was instructed that with respect to coercion:

"Coercion, as I have used that term, means a threat of serious or physical restraint
against a person. ***A threat is a serious statement expressing an intention to inflict
harm***, at once or in the future, as distinguished from idle or careless talk,
exaggeration, or something said in a joking manner." JA 1494.

the defendant use violent physical force in the commission.  The Government's own request for jury instructions clearly indicate that they envisioned that this offense could be, and would be, committed in a non-violent way.  JA 1018-1020.

Thus, even *if* Appellant Ventura committed 18 USC § 1591 in a violent way, the issue is whether a jury could conclude beyond a reasonable doubt based on the *elements* whether the Appellant committed an offense that can be defined as a "crime of violence."  *Descamps,* 133 S.Ct. at 2283 ("[A] conviction under the law cannot count… even if the defendant actually committed the offense [in a violent way].  ***The key, we emphasized, is elements, not facts***.") (emphasis added).  Here, to be a "crime of violence" there must be an element of violent physical force.  There is no such required element here.  Alternatively, the nature of the offense must be one that has a substantial risk of violent physical force.  Here, however, an offense like 18 USC § 1591 which can be committed by way of misstatements, or threats to ones "reputation" or "financial interests" cannot be such an offense.

Recently, this Court was faced with a similar issue in *United States v. Royal.*

---

"The term "serious harm" includes both physical ***and non-physical types of harm, including psychological, financial, or reputational harm***. That is sufficient under all the surrounding circumstances to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm." JA 1495.

54

731 F.3d 333, 341 (4th Cir. 2013).  There, the issue was whether Maryland's criminal

offense of second degree assault could ever be a crime of violence for ACCA

purposes.  This Court noted that Maryland's second degree assault can be committed

in a non-violent as well as a violent manner.  *Id.*  Because, however, a Maryland jury

never is required to "unanimously agree" on whether the offense was committed in

a violent way or a non-violent way, the statute can never be a crime of violence.  *Id.*

at 341-42.  Because Maryland second degree assault, like 18 USC § 1591 provides

alternative means of satisfying a single element, the "modified approach has no role

to play." *Id.* at 341 (quotation and citations omitted).

> Under such an analysis, the Court must:

> apply the traditional categorical approach, under which we look "only
> to the statutory definition of the state crime and the fact of conviction to
> determine whether the conduct criminalized by the statute, ***including the
> most innocent conduct***, qualifies as a 'crime of violence.'

*United States v. Royal,* 731 F.3d 333, 341-42 (4th Cir. 2013) *cert. denied,* 134 S. Ct.

1777 (2014), *citing United States v. Torres–Miguel,* 701 F.3d 165, 167 (4th Cir.2012)

(emphasis supplied).

Using the same analysis, a jury could conclude that Ventura committed the

charged offense under 18 USC § 1591 in a non-violent way – one that involved no

violent physical force.  Nor was the jury requested to make a finding that the offense

was committed in a violent fashion.  As *Descamps* was decided after the jury verdict

in the trial below, the jury could not have been instructed on this. The conviction and

sentence for 18 USC § 924(c) therefore must be vacated.

### IV.    THERE WAS INSUFFICIENT EVIDENCE TO SUSTAIN THE CONVICTION OF APPELLANT FUERTES ON COUNT 6, FOR SEX TRAFFICKING OF R.D.F. BY FORCE, FRAUD AND COERCION DURING THE PERIOD AFTER DECEMBER 23, 2008.

**Standard of Review**

This Court reviews a district court's ruling on a motion for judgment of

acquittal *de novo. United States v. Romer*, 148 F.3d 359, 364 (4th Cir. 1998). The

Court must determine whether a rational jury could have found the essential elements

of the crime beyond a reasonable doubt, and in this determination considers the

evidence in the light most favorable to the government. *United States v. Tresvant*, 677

F.2d 1018, 1021 (4th Cir. 1982); *United States v. Bynum*, 604 F.3d 161 (4th Cir.

2010). A jury verdict will be upheld if there is "substantial evidence" to support it,

*Glasser v. United States*, 315 U.S. 60, 80 (1942), and this is defined as "evidence that

a reasonable finder of fact could accept as adequate and sufficient to support a

conclusion of a defendant's guilt beyond a reasonable doubt." *United States v. Young*,

609 F.3d 348, 355 (4th Cir. 2010). In determining whether there is substantial

evidence, the court should allow the government "all reasonable inferences that could

be drawn in its favor." *United States v. Harvey*, 532 F.3d 326, 333 (4th Cir. 2008).

**Argument**

The verdict of a trial jury will be upheld if there is substantial evidence to support it. *Burks v. United States,* 437 U.S. 1, 17 (1978). In undertaking this review, the appellate court will accord the Government all reasonable inferences from the facts and evidence properly adduced to those propositions which the Government seeks to establish, *United States v. Tresvant,* 677 F.2d at 1021, viewing the evidence in the light most favorable to the Government, *Jackson v. Virginia,* 443 U.S. 307, 319 (1979). The standard is the familiar one, whether "any rational trier of fact" could have found the elements of the offense to exist to the reasonable doubt standard. *Id.*

Where, however, the record shows a lack of evidence from which a jury could find guilt beyond a reasonable doubt, the conviction should be reversed and the matter remanded for the entry of a judgment of acquittal. *See United States v. Lowe*, 65 F.3d 1137, 1142 (4th Cir. 1995); *Jackson v. Virginia*, 443 U.S. at 317 ("[A] properly instructed jury may occasionally convict even when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt . . . . In a federal trial, such an occurrence has traditionally been deemed to require reversal of the conviction."); *Ortega- Rodriguez v. United States*, 507 U.S. 234, 249 (1993) ("In the class of appeals premised on insufficiency of the evidence, . . . retrial is not permitted in the event of reversal.").

57

Count 6 charged Appellant Fuertes, along with Appellant Ventura, with the sex trafficking of R.D.F. The jury acquitted Appellant Fuertes for any conduct on or before December 23, 2008. JA 1510. It only convicted him for conduct which followed that date. The conduct which followed that date consisted of a single incident which Ms. Duenas claimed Appellant Fuertes might have witnessed, and no more.

While at a brothel location in Glen Burnie and working for Appellant Ventura, Ms. Duenas declined to have sex with a black customer, and as a result, she claimed Ventura beat her with a belt. JA 1195. She claimed that Appellant Fuertes did not witness this, but that he was on the premises when this took place and that she screamed. JA 1196. She did not claim to have discussed this with Fuertes, nor that he ever demonstrated any awareness of what had transpired. This was the sole instance of force or fraud or coercion in the period after December 23, 2008, which the government adduced during the trial.

JA1193-1197.

Of equal importance, Ms. Duenas denied being forced into sex repeatedly, as was drawn out of her on cross-examination. JA 1341-1345. Given opportunities to leave, she chose not to do so. JA1326-1327.

In a carefully constructed post-trial motion, Appellant Fuertes made the lack

58

of evidence adduced at trial manifest.

There can be no real question but that the jury found Mr. Fuertes guilty solely upon a theory of reckless disregard. The evidence supporting actual knowledge was at least as persuasive, if not more so of Mr. Fuertes' actual knowledge, to the extent it existed, during the former period than the latter. During this earlier period the evidence adduced supported the finding that Mr. Fuertes was present with Ms. Duenas Franco at Madison Street when it was raided, and he went with her to the police, when she tendered the letter inculpating another person in prostitution, but not Mr. Ventura. This, taken in sum, did not sustain a verdict of guilt relative to Mr. Fuertes, and the jury did not find him culpable during this earlier period. It necessarily follows that, with even less evidence after December 23, 2008, which would go to establish his actual knowledge, the basis for the jury finding of guilt resides solely upon his conduct after December 23, 2008, which demonstrated his "reckless disregard of the facts concerning the use of coercion." Instruction No. 40 (p. 78).[*see* JA 1496] The instruction further defined this: "The phrase 'reckless disregard of the facts' means deliberate indifference to facts which, if considered and weighed in a reasonable manner, indicate the highest probability that Ms. Duenas Franco was coerced to engage in a commercial sex act." *Id.* [JA 1496]

Ms. Duenas Franco's testimony, both days of which are appended hereto, makes clear that there was no basis for a finding of Mr. Fuertes' reckless disregard which would comport with this definition. At no time was Mr. Fuertes present when Ms. Duenas Franco was forced by Mr. Ventura into sex (T. April 15, p. 25), [JA 1193, 1541] although they lived under the same roof at Madison Street (T. April 15, pp. 19, 22). [JA 1187-1192,1535-1538] Nor was he present when another girl, "Cassandra," was beaten by Mr. Ventura and forced to have sex (T. April 15, p. 44). [JA 1212-1213, 1560-1561] Mr. Fuertes was with Ms. Duenas Franco living at Hollins Ferry on the only one time when physical violence was directed toward Ms. Duenas Franco by Mr. Ventura, but he was not present when this took place. (T. April 15, pp. 27-28). [JA 1196, 1543-1544] At no time did Ms. Duenas Franco discuss this with Mr. Fuertes, and she could not say that he heard her screams or knew the reason therefore. When she moved from Hollins

Ferry, Mr. Fuertes remained. (T. April 15, p. 48). [JA 1217, 1564] The ties between Mr. Fuertes and Ms. Duenas Franco are plainly attenuated. It is as much for this attenuation, as for his marked different conduct, that Ms. Duenas Franco freely admitted under oath that she was not afraid of Mr. Fuertes, (T. April 15, p. 60), [JA 1228-1229, 1576] a hardly surprising response regarding a person whom she had "no reason" to fear (T. April 16, p. 81)., [JA 1360-1361 ,1687]who never "hit" nor "beat" her, who was "kind" to her, who did not take advantage of her, who never "restrained" her (T. April 16, p. 81). 1360-1361 ,1687] Most significantly, although her total time on the stand approached eight hours over two days, Ms. Duenas Franco did not ever seek to clarify or supplement these answers, so as to demonstrate a basis for Mr. Fuertes to know of the coercion so clearly imposed upon her by Mr. Ventura. It is such a basis – some facts – which is required, under the law, to establish reckless disregard on the part of a criminal defendant. Even accepting that Mr. Fuertes believed there was a high probability that facts establishing coercion existed, there was no evidence whatsoever of any deliberate actions by him to avoid learning of such facts. *Global Tech Appliances, Inc., v. SEB S.A.*, 563 U.S. —, 131 S.Ct. 2060, 2070 (2011). There factual record, taken as a whole, simply does not support the notion that Mr. Fuertes engaged in a "purposeful avoidance of the truth." *United States v. Lanza,* 790 F.2d 1015, 1024 (2d Cir. 1986). Indeed, in light of the remarkably voluntary nature of the many other women who involved themselves in this curious form of "circuit" prostitution, traveling from location to location, working at each a week at a time, with the knowledge of their husbands or boyfriends, makes clear that the weight of the evidence lay upon the side of the ledger suggesting that Mr. Fuertes actually believed that Ms. Duenas Franco was no less willing a participant than the many other women involved. During the entire time she had an ongoing relationship with Mr. Ventura, and was his girlfriend, for lack of a better term. Indeed, the sole incident of violence toward her of which Mr. Fuertes even possibly was aware, Mr. Ventura's striking of her with a belt at Hollins Ferry, was, in light of Mr. Ventura's crude and violent nature, at least as if not more consistent with an incident of domestic violence. There was no evidence adduced of the relationship of this act to the coercion element of the § 1591 offense being made clear to any person other than Ms. Duenas Franco. There was nothing in this for Mr.

Fuertes to consciously avoid, and his blindness therefore was not wilful.

JA 1513-1515.  The inserted JA references are to the trial transcript and the excerpt

which was available to defense counsel for sentencing.

The offense charged in count 6 involves sex trafficking by force, fraud and

coercion, and not mere involvement in the prostitution trade, as would be sufficient

for the count 1 conspiracy, and which the district court and government appear to

have believed was sufficient.  Appellant does not contest the former count, as there

was adequate evidence to sustain the § 371 charge.  The single instance of violence

against Ms. Duenas, JA 1373 ("On one occasion."), which there is no evidence that

Appellant Fuertes even was aware of, as he did not witness it, is not sufficient to

sustain a verdict beyond a reasonable doubt.  Indeed, it is difficult to see how the jury

did so,  which brings the discussion back to the improper admission of evidence

relating to the murder of "El Pelon," and the other acts of violence attributed to

Appellants, which served to assassinate their character, and place a thumb on the

scale of the jury's deliberations on this count.

## <u>REQUEST FOR ORAL ARGUMENT</u>

Appellants request oral argument, as they believe that it will assist the decisional process by assisting this Court in considering the important issues, including those of first impression raised in the instant Joint Brief.

## CONCLUSION

For the foregoing reasons, Appellants Fuertes and Ventura respectfully request this Court to reverse the judgments of the United States District Court for the District of Maryland as to each of them, and to remand their respective causes with an order for new trials on the merits, and to tax the costs of these proceedings to Appellee.

September 2, 2014            Respectfully submitted,

                         _____/s/_____

MICHAEL D. MONTEMARANO
Michael D. Montemarano, P.A.
10630 Little Patuxent Parkway
Suite 146
Columbia, MD 2144
(410) 992-0067 /fax 992-6915
montemarano67@gmail.com
Counsel for Appellant Fuertes/CJA Counsel
       Lead Appellate Counsel

                         _____/s/_____

NICOLAS VITEK
Vitek Law LLC
111 South Calvert Street
Suite 2700
Baltimore, MD 21202
(410) 317-8500/fax 317-8511
Vitek@viteklaw.com
Counsel for Appellant Ventura/CJA Counsel

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

Certificate of Compliance with Type-Volume Limitation,
Typeface Requirements and Type Style Requirements

1.  This brief complies with the type-volume limitation of Fed. R. App.
    32(a)(7)(B) because:

    The word count of this brief is <u>14, 398</u>

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)
    and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    This brief has been prepared in a proportionally spaced typeface using
    <u>WordPerfect 12, Times New Roman, 14 point</u>.

/s/
_____

MICHAEL D. MONTEMARANO

64

## <u>CERTIFICATE OF SERVICE</u>

In accordance with Rule 25 of the Rules of the United States Court of Appeals for the Fourth Circuit, I hereby certify that I have this 2nd day of September, 2014, filed the required copies of the foregoing Brief of Appellant and copies of the Joint Appendix in the Office of the Clerk of the Court, and have served the brief and appendix electronically through CM/ECF, to Michael Cunningham, Esq., Assistant United States Attorney, 36 South Charles Street, Suite 400, Baltimore, MD, Counsel for Appellee.

September 2, 2014

_____/s/_____
MICHAEL D. MONTEMARANO